UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RICHARD MARTIN,         ) | |
|                   ) | |
|        Plaintiff,    ) | |
|                   ) | |
|     v.                ) | CASE NO. 1:06-cv-0452-DFH-WTL |

RICHARD MARTIN,                     )
                                    )
          Plaintiff,                )
                                    )
     v.                             )   CASE NO. 1:06-cv-0452-DFH-WTL
                                    )
INDIANA STATE POLICE,               )
DEAN WILDAUER, AND OTHER            )
UNKNOWN STATE POLICE TROOPERS,      )
                                    )
          Defendants.               )

ENTRY ON MOTIONS FOR SUMMARY JUDGMENT

This case presents some interesting questions that arose when Indiana law
enforcement authorities transferred to federal authorities the property (cash) that
they had seized under the authority of an Indiana state court's search warrant
without obtaining the state court's permission for the transfer.  As will be seen
below, the court answers some of the questions and remands others to the state
courts.

Indiana State Police Trooper Dean Wildauer received information that
plaintiff Richard Martin's residence in Indianapolis was the site of a marijuana
growing operation.  After examining Martin's trash and discovering evidence of
illegal drugs, Trooper Wildauer obtained a search warrant for Martin's residence.
While searching the residence, Indiana State Police troopers discovered and seized

more than $300,000 in U.S. currency that was buried in Martin's flowerbeds. Trooper Wildauer contacted the United States Customs and Border Patrol to determine if the agency would be interested in initiating a federal forfeiture for the seized currency. U.S. Customs agreed to a federal forfeiture and contacted Martin to inform him of the federal forfeiture. Martin failed to respond with a timely challenge to the federal forfeiture, and U.S. Customs completed an administrative forfeiture.

Martin filed this lawsuit in state court against the Indiana State Police, Trooper Wildauer, and other unknown State Police troopers. The defendants who had been served with process then removed the case to this court pursuant to 28 U.S.C. § 1441(b) and 1446. Martin seeks relief under 42 U.S.C. § 1983 for alleged violations of his Fourth and Fifth Amendment rights under the United States Constitution. Martin also asserts claims under Indiana law for violations of the Indiana Constitution, conversion, and violations of Indiana forfeiture statutes. Both sides have filed motions for summary judgment. As explained in detail below, the stipulated facts show that the defendants did not violate Martin's Fourth or Fifth Amendment rights. The stipulated facts certainly indicate that the state troopers circumvented or even violated Indiana law by transferring the property to a federal agency without an order from the court that issued the search warrant that provided authority for the seizure of the property. However, that issue and the formulation of any appropriate remedy for such violations are matters for the state courts and the enforcement of state law. The court grants

summary judgment for defendants on the federal claims and remands Martin's state law claims to the state court where he originally sought relief.

*Summary Judgment Standard*

Summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The fact that the parties have filed cross-motions for summary judgment does not affect the applicable standard; the court should deny both motions if there is a genuine issue of material fact. See, *e.g.*, *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir. 1993). Summary judgment should be granted if no rational fact finder could return a verdict in favor of the non-moving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court's ruling on a motion for summary judgment is akin to that on a motion for directed verdict. The essential question for the court in both is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. When ruling on the motion, the court must construe the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in that party's favor. *Id.* at 255. If the non-moving party bears the burden of proof on an issue at trial, that party "must set out specific facts showing a genuine issue for

trial." Fed. R. Civ. P. 56(e); see also *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999).

*Facts For Summary Judgment*

The parties stipulated to the following facts for purposes of summary judgment. Dean Wildauer, Charles Wix, Dennis Wade, and William Etter are troopers with the Indiana State Police Department ("ISP"). Troopers Wildauer, Wix, Wade, and Etter are cross-deputized officers of the United States Customs and Border Patrol ("U.S. Customs"). Cross-deputized officers are "task force officers" who work jointly with U.S. Customs agents. They do not receive federal badges but do receive identification cards. U.S. Customs pays the ISP to cover the expense of the officers' overtime incurred on U.S. Customs assignments.[1]

When cross-deputized officers seize more than $10,000 in U.S. currency, they have the option to take the money either to an Indiana county prosecutor or to one of several federal agencies.[2] As cross-deputized officers, Troopers Wildauer,

---

[1]Dan Deal, a U.S. Customs employee, is Trooper Wildauer's supervisor. He has the authority to discipline Trooper Wildauer. Trooper Wildauer does not speak with Deal daily but only once every couple of weeks. It is unclear if Deal supervises the other troopers or if they have other supervisors when they work for U.S. Customs.

[2]When a federal agency is not involved in an ISP seizure of property, ISP's standard operating procedure instructs that the property cannot be transferred to a federal agency until a motion for transfer of property has been filed with the state court in the county of venue and the court has issued an order to transfer the property.

Wix, Wade, and Etter could seize money pursuant to federal law.  Under federal forfeiture proceedings, ISP would receive eighty percent of the seized funds. Stipulated Facts ("S.F.")  ¶ 54.  In a state forfeiture proceeding, by contrast, ISP would be reimbursed for its expenditures, but the remainder of the money would be distributed among the county prosecutor's office, a teachers' fund, and other State entities.  S.F. ¶ 18.

In February 2004, Trooper Wildauer received information indicating that the residence at 514 Peach Tree Lane, Indianapolis, Indiana, owned by Richard and Pamela Martin, was the site of a marijuana growing operation.  Trooper Wildauer investigated the trash from the Peach Tree Lane residence.  He discovered several items, including pieces of paper with the names of both Richard and Pamela Martin on them, marijuana stems, and a marijuana "roach."  Pl. Ex. 1 at 5.  On March 3, 2004, Trooper Wildauer submitted an affidavit to Judge Ault of the Marion Superior Court requesting a search warrant for the residence at 514 Peach Tree Lane.  The affidavit included a description of Trooper Wildauer's knowledge about drugs and drug trafficking, information he gathered from the informant, and evidence he obtained from the trash.  Pl. Ex. 1 at 2-6.  Judge Ault issued a search warrant that authorized the troopers to enter the residence with the following description:

> A one story single family dwelling, with white and green siding, a green colored shingle roof, an enclosed front porch, a brown mailbox sits in front of the residence with the numbers 514 on the front of the mailbox, a large tree is in the front yard in front of the enclosed front porch, a chain linked

fence is on one side of the residence and a tall  privacy fence is on the other. The residence is located at 514 Peach Tree Lane, Indianapolis, Marion County, Indiana 46219.

S.F. Ex. A.  The search warrant authorized the troopers to search for and seize the following materials:

> Marijuana, materials used to grow marijuana, drug paraphernalia, proceeds from drug sales, drug ledgers, documents related to the crime of dealing marijuana, any materials related to the distribution of illegal drugs, any locked boxes or safes that can not be opened at the residence.

S.F. Ex. A.

On March 3, 2004, at approximately 10:00 p.m., Troopers Wildauer, Wix, Wade, and Etter and officers from the Lawrence Police Department executed the search warrant.  None of the troopers searching the residence were full-time U.S. Customs agents, but they were operating under U.S. Customs authority, which paid for their overtime.  Both Richard and Pamela Martin were present during the search.  Wade was in charge of searching the residence.  Inside the residence, the troopers located:

> a bag of marijuana by female shoes, a marijuana plant growing operation that consisted of approximately one hundred and thirty three (133) plants, equipment to facilitate the growth of the marijuana plants, three large PVC pipes modified so that items could be stored in the pipes, five drying marijuana plants, boxes of plastic bags containing marijuana, and account ledgers with detailed transaction histories.

S.F. ¶ 38.

In addition, a police dog aptly named "Max on the Money" detected and signaled the presence of currency in flowerbeds less than one foot from the house. The troopers dug less than a foot into the flowerbeds and discovered buried PVC piping.[3]   The troopers opened the piping and discovered $306,920 in U.S. currency.  S.F. ¶ 42.  Trooper Wildauer did not instruct the troopers to dig in the flowerbeds but did assist in recovering some of the money from the flowerbeds. Trooper Wix transported the money from the residence not to the Marion Superior Court that issued the warrant authorizing the seizure, but to Bank One in Indianapolis, Indiana.

During the search of the residence, the troopers were in contact with U.S. Customs.  Following the search, Trooper Wildauer called Agent Materrelli, a U.S. Customs agent, and asked him if he would be interested in pursuing a federal forfeiture.[4]  Agent Materrelli agreed and told Trooper Wildauer that he would meet him at the bank the next day.  S.F. ¶ 50.  Agent Materrelli met Troopers Wildauer, Wix, Wade, and Etter at Bank One.  Bank One counted and accepted the money and in exchange issued a cashier's check to U.S. Customs and the United States Marshal Service.

---

[3]On March 5, 2004, Trooper Wildauer obtained a second search warrant to dig in the yard.

[4]At some point in time, Trooper Wildauer contacted a deputy prosecutor in Marion Superior Court 11 and told him that the officers planned to do a federal forfeiture.  The deputy prosecutor told him that he "was okay with" a federal forfeiture.  S.F. ¶ 74.

U.S. Customs initiated forfeiture proceedings.  In a letter sent on March 8, 2004, U.S. Customs notified Richard Martin that the money was subject to seizure and forfeiture pursuant to 18 U.S.C. §§ 981 and 1956 and 21 U.S.C. § 881.  S.F. ¶ 56.  U.S. Customs informed Martin that he had a right to seek relief from the seizure.  If he failed to petition for relief within thirty days from the date of the letter, U.S. Customs informed him, administrative forfeiture proceedings would commence under authority of 19 U.S.C. § 1607 and 19 C.F.R. § 162.  S.F. ¶ 58.

Martin did not respond within the thirty day deadline.  More than four months later, on July 23, 2004 U.S. Customs received an election of proceedings form signed by Richard Martin seeking to have the matter referred to federal court. S.F. ¶ 59.  The letter was postmarked July 21, 2004, long after the thirty days had run.  U.S. Customs considered the election untimely and considered the money forfeited.  U.S. Customs then divided the money among U.S. Customs, ISP, and the Lawrence Police Department.  ISP received something less than eighty percent of the seized funds "because some of the returned funds were shared with the Lawrence Police Department, which also participated in the investigation."  S.F. ¶ 54.

The State of Indiana charged Richard Martin with Dealing in Marijuana as a class C Felony.  Martin pleaded guilty to the lesser included offense of Dealing in Marijuana as a class D Felony.

Prior to the search on March 3, 2004, Richard Martin had earned no (lawful) income since 1991.  See S.F. ¶ 65.  Between 1991 and March 3, 2004, Pamela Martin earned at most $34,000 in any given year.  S.F. ¶ 66.  In addition to owning the residence, Richard Martin "owned four vehicles, a pontoon boat, jet skis, and a trailer on a lake."  S.F. ¶ 69.  Neither Richard Martin nor Pamela Martin listed the cash from the flowerbed "or a claim to the money as a marital asset in divorce proceedings . . . ."  S.F. ¶ 68.  Richard Martin claims here that he owns the money and had buried it for safekeeping.  When asked several questions during his deposition about how he acquired the money – if he saved the money, if he reported the money to the IRS, and if he earned the money from selling illegal drugs – Martin invoked his Fifth Amendment privilege against self-incrimination and refused to answer under oath.  S.F. ¶ 72.

*Discussion*

In Count I of the Complaint, Martin alleges that Trooper Wildauer and other unknown troopers violated his "right to be free of searches outside the warrant process" under the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Constitution of Indiana.  In Count II, Martin alleges that the defendants violated Indiana Code § 35-33-5-5 by transferring the seized money to the federal authorities without an order from the state court authorizing them to do so.  In Count III, Martin alleges that the defendants violated his due process rights under the United States Constitution and the Indiana Constitution

by failing to give him notice and a meaningful opportunity to be heard before transferring his money to the federal government.  In Count IV, Martin alleges that the defendants violated Article 1, Section 12 of the Indiana Constitution by taking his property without just compensation or due process.  In Count V, Martin alleges that the defendants committed the tort of conversion of his property.  In Count VI, he alleges that the defendants violated Indiana Code § 34-24-1-3 by keeping his property without bringing a forfeiture action in an Indiana court within 180 days after the seizure.  In each count except for Count V, Martin seeks damages in the form of the return of the currency, with interest.  In Count V, Martin seeks treble damages, attorney fees, and interest.  Martin also claims that U.S. Customs lacked jurisdiction over the seized currency to initiate a federal forfeiture action because ISP and the troopers did not obtain a transfer order from the Marion Superior Court.  Defendants seek summary judgment as to all claims, as does plaintiff Martin.

I.    *Federal Claims Against the Indiana State Police*

Martin brings his federal constitutional claims in Count I and Count III pursuant to 42 U.S.C. § 1983, which provides a cause of action against "Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  The Supreme Court has held that a state "is not a person within the meaning of § 1983."  *Will v. Michigan Dep't*

*of State Police*, 491 U.S. 58, 64 (1989).  Because ISP is a state entity, it is not subject to suit for damages under § 1983 and is entitled to summary judgment on all federal claims against it.[5]


II.     *Fourth Amendment Claims Against Trooper Wildauer*

In Count I, Martin alleges that Trooper Wildauer violated his Fourth Amendment right by obtaining and executing a search warrant that was not supported by probable cause and by exceeding the scope of the warrant by searching the "curtilage" of the house and by opening the PVC pipes buried in his flowerbeds.  Trooper Wildauer is entitled to summary judgment on the merits of these claims.


A.     *Probable Cause for the Search Warrant*

Martin contends that the probable cause affidavit was invalid because it was "not based on reliable information," does not contain Martin's name, and does not contain any "probable cause whatsoever that any items subject to seizure were believed to be buried in Mr. Martin's yard."  Pl. Mem. 26.[6]

---

[5]Because the defendants removed the action to federal court, they waived the defense of Eleventh Amendment immunity.  See *Lapides v. Board of Regents of University System of Georgia*, 535 U.S. 613, 616 (2002).

[6]Martin also contends that Trooper Wildauer violated Indiana Code § 35-33-5-2(b) by obtaining the warrant based on hearsay evidence and failing to establish the credibility of the source.  Pl. Mem. 26-27.  To the extent this claim is based on a theory that the Indiana statute imposes requirements more demanding than the
(continued...)

The Fourth Amendment requires probable cause to support a search warrant.  Under the Fourth Amendment, courts have a "strong preference" for searches conducted pursuant to a warrant as distinct from attempts to rely on various exceptions to the warrant requirement.  See *Illinois v. Gates*, 462 U.S. 213, 236 (1983).  In evaluating probable cause, the judge's task is to make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Id.* at 238.  "Warrants are presumed valid."  *United States v. Childs*, 447 F.3d 541, 546 (7th Cir. 2006).  Where a neutral judge has found probable cause to support a search and has issued a search warrant, a reviewing court's task is to determine whether substantial evidence in the record supports the issuing judge's decision.  *United States v. Lloyd*, 71 F.3d 1256, 1262 (7th Cir. 1995).  Reviewing courts examine the totality of the circumstances before the issuing judge to determine if there existed probable cause for the search.  *United States v. Koerth*, 312 F.3d 862, 866 (7th Cir. 2002).

Martin contends that Trooper Wildauer's affidavit is invalid because he did not verify the credibility of his informant.  However, the undisputed evidence shows that Trooper Wildauer performed independent research that provided him

---

[6](...continued)
Fourth Amendment, the court does not address the issue.  Any such claim would be included within the matters that this federal court remands to the state court.

with some first-hand knowledge of marijuana in Martin's home.  In his affidavit, Trooper Wildauer stated:  "On 3-3-04 At Approximately 11:25 Trooper Wildauer And Detective Ronald Shoemaker With The Assistance Of The Trash Collectors Recovered 5 White Plastic Trash Bags."  Pl. Ex. 1 at 5.  Trooper Wildauer stated that he found "Marijuana stems, a Marijuana Roach, Marijuana Residue . . . And An Empty Pack of Rolling Papers" in the trash bags.  *Id.*  Trooper Wildauer found the evidence in the trash along with pieces of paper with Martin's and his wife's names on them.  The combination of the informant's tip and the corroborating information that Trooper Wildauer gathered from the trash provided the magistrate with a "fair probability that contraband or evidence of a crime," see *Gates*, 462 U.S. at 236, would be found at the Martin residence.

Martin also contends that the search warrant lacked probable cause because it did not explicitly name him.  The Fourth Amendment does not require that a search warrant name the owners or residents of the property to be searched.  Martin also asserts that the "affidavit does not provide any probable cause whatsoever that any items subject to seizure were to be buried in Mr. Martin's yard."  Pl. Mem. 26.  The issuing court did not err by finding probable cause to support the search warrant.  As explained below, there was no need for more specific probable cause to search the flowerbeds.  The search warrant authorizing a search of the residence extended to the search of the curtilage.

B.    *The Execution of the Search Warrant*

-13-

Martin contends that Wildauer and the other officers violated the Fourth Amendment by searching the flowerbeds right outside the residence.  The Fourth Amendment provides in relevant part:  "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  The purpose of the Warrant Clause is to prevent general searches and searches with "the character of the wide-ranging exploratory searches."  *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).  Searches instead should be tailored to the "specific areas and things for which there is probable cause to search."  *Id.*  The Fourth Amendment and *Maryland v. Garrison* require a tailored search, not an exploratory search.

The "curtilage" is the area surrounding a house that is closely and intimately connected to the house and is usually enclosed in some way.  Black's Law Dictionary 384 (6th ed. 1990).  The problem of curtilage arises most often in the context of searches of such outdoor areas without a search warrant.  See, *e.g.*, *United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002); *United States ex. rel. Saiken v. Bensinger*, 489 F.2d 865, 867-68 (7th Cir. 1973).  However, case law also indicates that a search warrant authorizing a search of a residence also authorizes a search of the curtilage of the residence, at least where the objects of the search might reasonably be found in the curtilage.[7]

---

[7]Both sides acknowledge that the flowerbeds are part of the curtilage of the Martins' home.

For example, in *Sowers v. State*, 724 N.E.2d 588, 590 (Ind. 2000), the Indiana Supreme Court established that a search warrant for a single residence authorizes a search of the yard and outbuildings of the residence.  Flowerbeds are in the yard of the residence and are therefore included within the curtilage and encompassed by the search warrant, at least so long as one might reasonably expect to find the objects of the search in that location.

*Sowers* followed *United States v. Gorman*, 104 F.3d 272, 274-75 (9th Cir. 1996), in which the Ninth Circuit reviewed the available case law from several states and federal courts and reached the same conclusion.  The court described the curtilage as "simply an extension of the residence's living area" and explained that "such extensions become part of the residence for purposes of a search warrant."  *Id.* at 274.  Following the reasoning of the Indiana Supreme Court in *Sowers* and the Ninth Circuit in *Gorman*, the flowerbeds here are part of the curtilage, are deemed an extension of the residence, and were within the scope of the search warrant.  The officers did not exceed the scope of the warrant by searching in the flowerbeds.

Martin also contends that Trooper Wildauer violated the Fourth Amendment by opening the PVC pipes because he needed a separate search warrant to open the pipes.  Martin relies on *United States v. Johns*, 469 U.S. 478 (1985); *United States v. Ross*, 456 U.S. 798 (1982); *Arkansas v. Sanders*, 442 U.S. 753 (1979); *United States v. Chadwick*, 433 U.S. 1 (1977); and *United States v. Mazzone*,

782 F.2d 757 (7th Cir. 1986).  These cases examined the automobile exception to the warrant requirement, which allows officers who have probable cause to search an automobile to search certain containers within the automobile *without* a warrant.  See *Ross*, 456 U.S. at 823-24.  This case does not involve an automobile, so the container limit to the automobile exception is inapplicable.

While the warrant did not explicitly authorize the troopers to open PVC piping that the trooper did not know about when they sought the warrant, the PVC piping was a container that was within the scope of the search warrant. While examining a "lawful search based on probable cause" in *United States v. Ross*, the Supreme Court considered what types of containers may be searched:

> A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search.  Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found.  A warrant to open a footlocker to search for marijuana would also authorize the opening of packages found inside.  A warrant to search a vehicle would support a search of every part of the vehicle that might contain the object of the search.  When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand.

*Id.* at 820-21.

In this case, the search warrant authorized the troopers to search the residence and the curtilage and to seize marijuana and proceeds from drug sales. Under the reasoning of *Ross*, the warrant allowed the officers to open containers that could contain these items.  The police dog detected the presence of currency in the flowerbeds, where the troopers located the PVC pipe.  *Ross* permitted the officers to open the container because the currency or marijuana could be located within the containers.  Trooper Wildauer therefore did not exceed the scope of the authorized search when he opened the PVC pipe.  Trooper Wildauer is entitled to summary judgment on all Fourth Amendment claims.[8]

III.    *Federal Forfeiture v. State Forfeiture*

In his cross-motion for summary judgment, Martin contends that the Marion Superior Court never relinquished legal control over the currency that was seized under the authority of its warrant.  Martin contends that any forfeiture proceedings should have been initiated in the Marion Superior Court.  He argues that without a transfer order from the state court, U.S. Customs lacked jurisdiction over the seized currency and that the federal forfeiture proceeding was invalid (though U.S. Customs is not a party to this action).  He contends that this violation of state law amounted to a violation of his federal constitutional right not

---

[8]In addition, the warrant allowed the officers to seize "any locked boxes or safes that cannot be opened at the residence."  This language implied that the search warrant permitted the troopers to open containers that *could* be opened at the residence, at least so long as they might hold items within the scope of the warrant.

to be deprived of property without due process of law.  Martin further contends that the State can no longer properly seek forfeiture under state law because the 180-day limitation period set by Ind. Code § 34-24-1-3(a) has passed.  He claims that he is entitled to a return of the seized currency because the state has exceeded the time allowed to initiate a forfeiture proceeding.

      A.    *Indiana Law on Jurisdiction Over Seized Property*

Indiana Code § 35-33-5-5 and Indiana Code § 34-24-1-3(a) establish the requirements for seizing property and state forfeiture proceedings.  Indiana Code § 35-33-5-5 provides in relevant parts:

> (a)    All items of property seized by any law enforcement agency as a result of an arrest, search warrant, or warrantless search, *shall be securely held* by the law enforcement agency under the order of the court trying the cause, except as provided in this section.
>
> *    *    *    *
>
> (c)    Following the final disposition of the cause at trial level or any other final disposition the following shall be done:
>
> (1)    Property which may be lawfully possessed shall be returned to its rightful owner, if known.  If ownership is unknown, a reasonable attempt shall be made by the law enforcement agency holding the property to ascertain ownership of the property.  After ninety (90) days from the time:
>> (A) the rightful owner has been notified to take possession of the property; or
>> (B) a reasonable effort has been made to ascertain ownership of the property;
> the law enforcement agency holding the property shall, at a convenient time, dispose of this property at a public auction. The proceeds of this property shall be paid into the county general fund.
>
> *    *    *    *

(j)      Upon motion of the prosecuting attorney, the court shall order property seized under IC 34-24-1 transferred . . . to the appropriate federal authority for disposition under 18 U.S.C. 981(e), 19 U.S.C. 1616(a), or 21 U.S.C. 881(e) and any related regulations adopted by the United States Department of Justice.

Indiana Code § 34-24-1-3 is part of the state forfeiture provisions, and it

provides in relevant parts:

(a)      The prosecuting attorney for the county in which the seizure occurs may, within ninety (90) days after receiving written notice from the owner demanding return of the seized property or within one hundred eighty (180) days after the property is seized, whichever occurs first, cause an action for reimbursement of law enforcement costs and forfeiture to be brought by filing a complaint in the circuit, superior, or county court in the jurisdiction where the seizure occurred. The action must be brought:

> (1) in the name of the state or the state and the unit that employed the law enforcement officers who made the seizure if the state was not the employer; and
> (2) within the period that a prosecution may be commenced under IC 35-41-4-2 for the offense that is the basis for the seizure.

(b)      If the property seized was a vehicle or real property, the prosecuting attorney shall serve, under the Indiana Rules of Trial Procedure, a copy of the complaint upon each person whose right, title, or interest is of record in the bureau of motor vehicles, in the county recorder's office, or other office authorized to receive or record vehicle or real property ownership interests.

(c)      The owner of the seized property, or any person whose right, title, or interest is of record may, within twenty (20) days after service of the complaint under the Indiana Rules of Trial Procedure, file an answer to the complaint and may appear at the hearing on the action.

(d)      If, at the end of the time allotted for an answer, there is no answer on file, the court, upon motion, shall enter judgment in favor of the state and the unit (if appropriate) for reimbursement of law enforcement costs and shall order the property disposed of in accordance with section 4 of this chapter.

-19-

To persuade the court that the warrant-issuing state court retains jurisdiction, Martin relies on *Scarabin v. Drug Enforcement Admin.*, 966 F.2d 989 (5th Cir. 1992). In *Scarabin,* a Louisiana state court issued a search warrant authorizing the police to search for evidence of drugs on a property owned by the plaintiff. The police executed the search warrant and seized cash. The police used the cash to buy a cashier's check for the same amount and gave the check to the DEA. The DEA then initiated forfeiture proceedings. After the defendant was deemed to have failed to respond properly to the forfeiture, the DEA initiated administrative forfeiture proceedings. The DEA then returned a portion of the proceeds to the state and local agencies that participated in the seizure. Substitute U.S. Customs for DEA, and that is exactly what happened here.

Harkening back to a trick play not often seen in modern football, the Fifth Circuit described the handoff of cash from the local police to the DEA and then back to the local police as a "flea-flicker play" that violated Louisiana law. *Id.* at 991.[9] The court determined that Louisiana law mandated that "property seized pursuant to a state warrant is retained under the issuing judge's control and direction until that judge disposes of it in accordance with state law." *Id.* The Fifth Circuit concluded that the DEA lacked *in rem* jurisdiction: "From the moment of seizure the state district court had exclusive control over the *res* by

_____

[9]In a flea-flicker play, the quarterback hands the ball off to a running back who charges toward the line and then, after the defense reacts to the run, turns and laterals the ball back to quarterback, who can then try to throw the ball to a receiver out of reach of the defense.

virtue of issuing the search warrant that procured the seized funds and never relinquished that control to the DEA . . . ." *Id.* at 993.  To obtain the funds, the DEA would have needed a turnover order from the state court.  *Id.* at 995.  The court concluded that the DEA lacked authority over the seized funds and dismissed the appeal.  *Id.* at 994.  The court noted that it expected that "the state court proceedings . . . [would] come to a just and legally correct resolution of this unfortunate affair."  *Id.*

Martin also relies on Judge Friedlander's dissenting opinion in *Tracy v. State*, 655 N.E.2d 1232 (Ind. App. 1995.)  During a controlled drug buy in a motel room, the plaintiff exchanged drugs for money.  As the plaintiff and his associate left the room, the police detained both men and seized money from the plaintiff. *Id.* at 1233.  The Indiana State Police and a local drug task force arrested the plaintiff, and federal DEA agents were present during the arrest.  *Id.* at 1234.  The local police released a money order in the amount obtained from the plaintiff to the DEA, which initiated federal forfeiture proceedings.  The DEA then returned portions of the money to the local police.  *Id.*

The majority of the Indiana Court of Appeals found that the money the plaintiff exchanged for drugs was outside the statute requiring a forfeiture proceeding because the police had not seized the money but had instead simply exchanged drugs for the money.  *Id.* at 1235.  The court determined that Indiana Code § 35-33-5-5 applied only to seizures pursuant to a warrant, a warrantless

search, or an arrest.  *Id.*  As for the money obtained from the plaintiff following his
detention, the court determined that the plaintiff had failed to prove that he was
the "rightful owner" of the money and that he "exercised joint control over the
money with" his associate.  *Id.* at 1236.


Judge Friedlander agreed with the majority that the money traded for drugs
had not been seized and did not need to be returned to Tracy, but he dissented
with respect to the money seized from Tracy's person when he was arrested.
Comparing the case to *Scarabin*.  Judge Friedlander noted that the DEA had
received the money order "without the knowledge, much less the authority, of the
state court."  *Id.* at 1236, quoting *Scarabin*, 966 F.2d at 991.  Judge Friedlander
found that the DEA lacked jurisdiction to initiate the forfeiture proceeding.  Judge
Friedlander also found the "flea-flicker" play to be "more unacceptable in this
instant case in view of the DEA's relative lack of involvement in the sting
operation" that had led to Tracy's arrest.  *Tracy*, 655 N.E.2d at 1237.  He
characterized the plaintiff's arrest as a "state operation, and not a DEA operation."
*Id.* at 1237.  Judge Friedlander would have found the "federal civil forfeiture
proceedings pertaining to that money [seized from Tracy's person] were invalid
because they commenced without the authority of the court then having
jurisdiction over the money."  *Id.*


Martin also relies on an Alaska Supreme Court case, *Johnson v. Johnson*,
849 P.2d 1361 (Alaska 1993).  In *Johnson*, the police seized $44,850 from the

plaintiff.  The police then contacted the DEA, which decided to "adoptively seize" the money through a federal forfeiture proceeding.  *Id.* at 1362.  The DEA initiated forfeiture proceedings and notified the plaintiff of the proceedings.  The plaintiff moved the court presiding over the criminal proceedings to suppress the seized currency as evidence and to return the money.  The court presiding over the criminal matter ordered the evidence suppressed and returned to the plaintiff.  *Id.* at 1362.  Despite the state court order, the DEA considered the money administratively forfeited because the plaintiff had failed to take any action.  *Id.* The DEA disbursed some of the money to the local police department for its participation in the seizure.

The Alaska Supreme Court determined that the "City violated state law regarding the disposition of seized property" when it transferred "the money without court approval."  *Id.* at 1363.  The court explained that the warrant-issuing court "retained jurisdiction over the money 'to the exclusion' of the DEA." *Id.* at 1364.  The court concluded that "because the district court was the first to obtain jurisdiction over the property, and because the City's transfer violated state law, the DEA's forfeiture had no effect."  *Id.* at 1364-65.  The court ordered the state to return any money it possessed to the plaintiff.  *Id.* at 1363.  The court also established that the local police had "committed conversion" by transferring the money "without any authority."  *Id.* at 1365.

Martin also cites *Conn v. State*, 496 N.E.2d 604 (Ind. App. 1986), and argues that Indiana law vests jurisdiction over seized property in the trial court presiding over the criminal investigation. In *Conn,* the court noted that Indiana Code § 35-33-5-5 "sustains the trial court's continuing jurisdiction over property seized in the course of a criminal investigation." *Id.* at 609.

The Seventh Circuit analyzed the issue of jurisdiction over seized property in *United States v. One 1979 Chevrolet C-20 Van* ("*C-20 Van*"), 924 F.2d 120, 121 (7th Cir. 1991). The court explained that forfeiture proceedings are *in rem* proceedings, and that "when state and federal courts each proceed against the same *res,* 'the court first assuming jurisdiction over the property may maintain and exercise that jurisdiction to the exclusion of the other.' . . . The purpose of the rule is '[t]o avoid unseemly and disastrous conflicts in the administration of our dual judicial system, and to protect the judicial processes of the court first assuming jurisdiction.'" *Id.*, quoting *United States v. $79,123.49 in U.S. Cash and Currency*, 830 F.2d 94, 96 (7th Cir. 1987), quoting in turn *Penn General Casualty Co. v. Pennsylvania*, 294 U.S. 189, 195 (1935).

In *C-20 Van* the Illinois state police had seized a van and later turned it over to the FBI, which brought federal forfeiture proceedings. The Seventh Circuit examined the language of the Illinois forfeiture statute that provided in relevant parts: "Property taken or detained under this Section shall not be subject to replevin, but is deemed to be in the custody of the Director *subject only to the order*

*and judgments of the circuit court having jurisdiction over the forfeiture proceedings.*"
*Id.* at 122 (emphasis added in appellate opinion).  The Seventh Circuit determined
that under Illinois law the "state court had jurisdiction over the van to the
exclusion of the federal court."  *Id.* at 123.  The court wrote:  "A local police
department may not take seized property and just pass it on as it pleases to the
FBI in flagrant disregard of state laws mandating judicial authority for such
turnovers."  *Id.* at 122.  The court determined that the FBI needed a turnover
order before it had jurisdiction.  *Id.* at 123.  The  court remanded the case to the
district court and instructed the district court to "order the vehicle returned to the
clerk of court for the county in which it was seized for further disposition."  *Id.*[10]

    Indiana law required an order before the currency seized under the
authority of the state court's search warrant could have been transferred to
anyone else's custody, including a federal agency.  Indiana Code § 35-33-5-5(a)
requires that property be held "under the order of the court trying the cause."  For
any such transfer, Indiana Code § 35-33-5-5(j) requires a motion by the
prosecuting attorney and an order from the court to transfer the property.  In this
case, the Marion Superior Court that issued the warrant retained legal control
over the seized property.  The court never relinquished its control and did not
issue a transfer order.  Applying the Indiana statute and following the reasoning

---

[10]Illinois later amended the relevant statute to allow the state's executive
branch officials (state's attorneys, equivalent to Indiana prosecuting attorneys) the
power to consent to such transfers, thus effectively superseding this holding of *C-
20 Van.*  See *United States v. Sixty-Two Thousand Six Hundred Dollars*, 899 F.
Supp. 378, 379 (N.D. Ill. 1995).

of *Scarabin* and *C-20 Van*, the court agrees that there was no valid transfer of jurisdiction from the state court, so that the federal forfeiture proceeded without jurisdiction over the *res*.  Without a transfer order, U.S. Customs lacked the authority to initiate forfeiture proceedings.

ISP and Trooper Wildauer assert that troopers were acting in their capacity as federal agents when they seized the currency and therefore U.S. Customs had authority over the seized currency.  However, they chose to proceed in the Indiana courts to obtain and execute the search warrant.  Indiana Code § 35-33-5-5 provides that "the court trying the cause" retains control over the seized property, not that the agency that physically seized the property retains control.  By issuing the search warrant, the Marion Superior Court retained control over the seized property unless and until it issued a transfer order.  The officers were acting under a state court warrant and should have transferred the seized property according to state law.  It is irrelevant that they were also cross-deputized federal officers.

B.    *Due Process Claims*

The next issue is whether the unauthorized transfer of the seized property violated any federal constitutional right.  In his complaint, Martin alleges that Trooper Wildauer violated his constitutional rights by failing to give him notice and the meaningful opportunity to be heard "before giving his money away to the

-26-

federal government." Compl. Count III ¶ 5.[11]  Martin is making a procedural due process claim in that he was not given a meaningful opportunity to be heard in the Indiana state court, who he claims had jurisdiction, before the property was transferred to federal court.[12]

The Fourteenth Amendment provides in relevant part that no State shall "deprive any person of life, liberty, or property, without due process of law," and the Fifth Amendment provides parallel protection from federal deprivations without due process of law.  To establish a deprivation of property without due process of law, Martin must show (1) that the offending actions were taken by someone acting under the color of state (or federal) law; (2) that the conduct deprived him of a constitutionally protected property interest; and (3) the alleged deprivation occurred without due process of law.  See *Germano v. Winnebago County*, 403 F.3d 926, 927 (7th Cir. 2005).  Martin contests the third step of the inquiry and claims that he was not given a meaningful opportunity to be heard before the money was transferred to the federal agency.  He claims that the transfer violated Indiana Code § 35-33-5-5 and Indiana Code § 34-24-1-3.

---

[11]As explained above, the Indiana State Police is not an entity that can be sued pursuant to § 1983.

[12]In his cross-motion for summary judgment, Martin claims that the transfer of his property to federal control also violated his Fourth Amendment rights.  The Fourth Amendment addresses search and seizures, the warrant process, and probable cause.  Martin's jurisdictional claim does not address any of those issues.  This issue must be resolved under the due process clauses of the Fifth and Fourteenth Amendments.

While ISP and Trooper Wildauer apparently violated Indiana state law by transferring the property to U.S. Customs without a transfer order from the issuing court, the defendants' failure to comply with state law does not mean that they violated Martin's federal due process rights under the United States Constitution.  As the Seventh Circuit has often explained:  "A violation of state law . . . is not a denial of due process, even if the state law confers a procedural right." *Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993).  Rather than ask whether state law was violated, the court must instead determine whether *federal* due process standards were violated.  See *id.* ("standard of due process is federal"), citing *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 541 (1985).

*Madewell v. Downs*, 68 F.3d 1030, 1044 (8th Cir. 1995), is convincing on these issues.  The Eighth Circuit in *Madewell* held that a state police department did not violate a plaintiff's due process rights by transferring seized property from the state court to the federal court without a transfer order, though the state law at the time did not specifically require a court order authorizing the transfer to a federal court or agency.  "What fundamental due process requires, or more specifically, what the Fifth Amendment requires, is that persons not be deprived of property without due process of law."  *id.*  "Adherence to the requirements of 21 U.S.C. § 881 provides the due process protections necessary to ensure that persons are not unconstitutionally deprived of property."  *Id.*

The Eighth Circuit also considered whether the DEA violated the plaintiff's due process rights by transferring the property. The court noted: "The claimant's due process rights concern the disposition of the property, including its actual forfeiture, rather than the adoption of the seizure by one sovereign after actual seizure by another." *Id.* at 1039. The court explained that "the claimant's due process concern is with the forfeiture of the property, not with the identity of the sovereign who ultimately undertakes the forfeiture action." *Id.*

The reasoning of *Madewell* is persuasive on the federal due process issues. Due process requires that an individual be given "notice and an opportunity for a hearing prior to the state's permanent deprivation of his property interest." *Porter v. DiBlasio*, 93 F.3d 301, 305 (7th Cir. 1996), citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982), and *Goss v. Lopez*, 419 U.S. 565, 579 (1975). The transfer of Martin's property from the state court to the federal agency – even if not authorized by state law – did not permanently deprive him of his property interest. Before he was permanently deprived of his property interest, Martin was afforded due process when U.S. Customs contacted him and notified him of the forfeiture. He was given an opportunity to respond, and he failed to do so. Martin's due process rights were protected when the federal government notified him of the federal forfeiture proceedings and gave him an opportunity to respond.

Martin finds some support for his possession, however, in *C-20 Van*, where the Seventh Circuit determined that the federal courts lacked jurisdiction over

seized property because state law required a turnover order before the property could be relinquished to the federal government.  The police department defended the transfer as a "routine, administrative matter."  *C-20 Van*, 924 F.2d at 122. The Seventh Circuit commented:  "it troubles us deeply that a local police department can ignore statutory directives as a 'routine and administrative' matter.  Arguments to the contrary, the due process clause of the Fifth Amendment still is alive and well. . . ."  *Id.* at 123.  However, *C-20 Van* does not hold that a claimant's federal due process rights are violated when a state government transfers property to the federal government without a state court transfer order required by state law.  The court was not given the opportunity to address a due process claim but rather was hearing an appeal from a federal forfeiture action.  The due process language was dicta, and the remedy for the violation of state law may be found elsewhere.

In his brief, Martin relies on *Tracy*, *Scarabin*, and *Johnson* to propose that the U.S. Customs lacked jurisdiction over the seized money.  These cases also do not represent the proposition that an individual's federal due process rights are violated when the police transferred the seized property.  In each of these cases, the courts were determining whether the federal court had jurisdiction over seized property.  None of the courts considered the claimant's due process rights.

Accordingly, in light of *Madewell* and the more general principle that a violation of state law does not necessarily amount to a federal due process

violation, the undisputed facts show that Trooper Wildauer did not violate Martin's federal constitutional due process rights.  Trooper Wildauer is entitled to granted summary judgment on the federal due process claims.


IV.    *State Law Claims*

In light of the court's decision to dismiss Martin's federal constitutional claims, this court must determine if it should continue to exercise supplemental jurisdiction over Martin's state law claims.  Under 28 U.S.C. § 1367, the federal court should ordinarily relinquish supplemental jurisdiction over state law claims when all federal claims have been resolved prior to trial.  There is a so-called "no brainer" exception to that rule, so that when the proper resolution of the state law claims is crystal clear, the federal court should conclude matters and avoid imposing additional work on busy state courts.  See *Van Harken v. City of Chicago*, 103 F.3d 1346, 1354 (7th Cir. 1997) (holding that district court should not have resolved debatable state constitutional claims on their merits).  The merits of Martin's state law claims, and especially the crafting of any appropriate remedies, cannot fairly be described as "no brainers."  This court's duty of comity toward Indiana courts in developing Indiana law directs the court to remand all state law claims to the state courts.


*Conclusion*

For the foregoing reasons, this court grants the defendants' motion for summary judgment on all claims arising under federal law. The court also finds that the undisputed facts show that U.S. Customs did not have authority over the seized currency. All of Martin's state law claims are hereby remanded to the state court. Final judgment shall be entered accordingly.

So ordered.

Date: January 29, 2008

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Donald G. Banta
INDIANA STATE ATTORNEY GENERAL
Donald.Banta@atg.in.gov

Cory Christian Voight
INDIANA STATE ATTORNEY GENERAL
cory.voight@atg.in.gov

Richard L. Brown, Jr.
BROWN TOMPKINS & LORY
rbrown@brown-tompkins-lory.com

Jeffrey S. McQuary
BROWN TOMPKINS LORY
jcquary@brown-tompkins-lory.com

David R. Hennessy
hen@indylaw4all.com